# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### PADUCAH DIVISION
### CIVIL ACTION NO. 5:14-CV-00183-TBR-LLK

ABIGAIL A. TUCKER,                                                        Plaintiff,

v.

RODNEY HEATON, *et al.*,                                             Defendants.

## MEMORANDUM OPINION

Abigail Tucker filed this action against Caldwell County, the City of Princeton, as well as numerous public officials, following her termination as a police officer for the Princeton Police Department and as the Animal Control Officer for Caldwell County, Kentucky. With discovery closed, those officials seek summary judgment as to Tucker's remaining claims. For the reasons that follow, Rodney Heaton, Bobby Lewis, Brock Thomas, Donna Thomas, and Caldwell County's Motion for Summary Judgment, [R. 45]; Don Weedman and the City of Princeton's Motion for Summary Judgment, [R. 50]; and Clifford West's Motion for Summary Judgment, [R. 51], are **GRANTED**.

## I.

### A.

Abigail Tucker worked as a full-time police officer for the Princeton Police Department and, beginning in April 2007, as the part-time Animal Control Officer for Caldwell County, Kentucky. [*See* R. 49 at 24 (Brock Thomas's Deposition).] From 2007 until 2010, Tucker had no knowledge of any complaints regarding her work performance as Caldwell County's Animal Control Officer. [*See* R. 56-1 at 2, ¶ 7 (Tucker's Affidavit); R. 56-2 at 1, ¶ 3 (Kilgore's Affidavit).] All of that began to change, however, after a dispute developed between Emily Tucker, her sister, and Rodney Heaton.

Sometime prior to August 2010, Emily Tucker entered into a land purchase contract with Heaton.  [*See* R. 45-2 at 1 (Tucker's Timeline); R. 48 at 56–63 (Heaton's Deposition); R. 56-1 at 2, ¶ 11.]  When Emily Tucker fell behind on the payments due under that contract, Heaton evicted her from the property and, aided by his sons, burnt some of her personal belongings.  [*See* R. 48 at 57–59; R. 56-1 at 2, ¶ 11.]  Emily Tucker and Patsy Tucker, her mother, approached G. L. Ovey, the Commonwealth's Attorney for the 56th Judicial Circuit,[1] to press charges against Heaton.  [R. 56-1 at 3, ¶¶ 12–13.]  However, Ovey refused to take any action against Heaton, [*id.*, ¶ 12], who happened to be a long-time friend of his, [R. 48 at 23].

Around the same time, Heaton was in the midst of running to become a Magistrate on the Caldwell County Fiscal Court, a position he secured in November 2010.  [*See* R. 45-2 at 2.]  While attending a parade in front of the Caldwell County Courthouse, Heaton supposedly talked about a "hit list" of people he "intended to get rid of."  [R. 56-3 at 1, ¶¶ 2–3 (Ward's Affidavit).]  The "hit list" included Tucker, Caldwell County Magistrate George Kilgore, Caldwell County Treasurer Connie Cartwright, and Caldwell County Recycling Coordinator James Oliver.  [*Id.*; *see also* R. 56-2 at 1, ¶ 7.]  The careers of those on Heaton's "hit list," as it just so happened, were short-lived: Oliver resigned shortly before Heaton took office; Kilgore resigned after Ovey threatened to indict him in March 2011; and Cartwright resigned around June 2012.  [R. 56-2 at 2, ¶¶ 8–10; *see also* R. 45-2 at 3.]

Ultimately, Tucker's fate was no better.  Shortly after taking office in November 2010, Heaton called Kilgore and asked him "to help . . . get rid of Abigail Tucker" as the

---

[1] The 56th Judicial Circuit encompasses Caldwell County, Livingston County, Lyon County, and Trigg County, Kentucky.  [R. 45-12 at 1, ¶ 1 (Ovey's Affidavit).]

Caldwell County Animal Control Officer.  [R. 56-2 at 1, ¶ 4.]  Kilgore declined.  [*Id.*, ¶ 5.]  Around that same time, Heaton approached Clifford "Skippy" West, his long-time friend who worked as a detective for Ovey in the Commonwealth Attorney's Office.  [*See* R. 65 at 22–23, 40–41 (Detective West's Deposition); R. 48 at 34.]  Heaton expressed concern about how the Caldwell County Animal Shelter, which Tucker managed, had been exceeding its budget.  [*See* R. 48 at 34–35, 37, 82–85.]  He asked Detective West to look into the Shelter's finances.[2]  [*Id.* at 35, 41.]

Subsequently, over a period of approximately two months, [R. 65 at 75], Detective West inquired about a variety of issues involving the Caldwell County Animal Shelter and, at some point, Tucker in particular.  Donna Thomas, an employee of the Shelter, was the principal, though not the only, source of information during that investigation.  Detective West interviewed her on three or four occasions.  [*See* R. 47 at 39–40, 41–44 (Donna Thomas's Deposition).]  She discussed, among other things, how the Shelter paid her.  [*Id.* at 23–26, 31–35.]  Based, in part, on that information, Detective West concluded that perhaps Tucker had been improperly accounting for donations and certifying inaccurate payroll records.  [*See* R. 65 at 37.]

---

[2] There is some dispute as to what prompted Detective Clifford "Skippy" West's investigation. Detective West recalled the investigation beginning when Sueann Loney, a friend of Donna Thomas and volunteer at the Caldwell County Animal Shelter, lodged a complaint with him regarding Abigail Tucker misappropriating funds from the Shelter.  [R. 65 at 31–34 (Detective West's Deposition).]  Three days after that call, Detective West interviewed Sueann and James Loney, her husband, at their home.  [*Id.* at 31–32.] Sueann Loney relayed her suspicions about Tucker's management of the Shelter to Detective West and told him that Donna Thomas had more information about the issue.  [*Id.* at 32–34.]  Detective West then interviewed Donna Thomas.  [*Id.* at 36–38; *see also* R. 47 at 23–25 (Donna Thomas's Deposition).]  It is quite possible, then, that Detective West's conversation with Rodney Heaton took place after Detective West had already started the investigation.  [*See* R. 65 at 23, 34, 56, 85–86.]

News of the investigation spread quickly throughout the Caldwell County Fiscal Court.  Detective West briefed Judge-Executive Brock Thomas[3] around February 2011, [*see id.* at 32–34; R. 49 at 34, 65–66], and Brock Thomas told Heaton about the investigation not too long thereafter, [*see* R. 48 at 46–47].  Detective West later confirmed, in a conversation with Heaton, that an investigation was underway.  [*See* R. 65 at 56, 85–86.]  From that point on, Heaton had no further discussions with either Brock Thomas or Detective West about the investigation.[4]  [*See* R. 48 at 44, 46–47.]  It appears as though Ovey was the only person whom Detective West continued to apprise of developments in the investigation, periodically preparing and presenting reports for his review.  [*See* R. 65 at 42–43, 60.]

Ovey notified Tucker of the formal commencement of an investigation into her activities related to the Caldwell County Animal Shelter in June 2011.  [R. 45-3 at 1 (Letter from Ovey to Tucker); *see also* R. 56-1 at 4, ¶ 25.]  Sometime after that, Detective West, at Ovey's direction, turned the investigation over to Detective Michelle Kent of the Kentucky State Police.  [*See* R. 45-12 at 3, ¶ 7 (Ovey's Affidavit); R. 65 at 55–56, 88–89.]  After handing his file over to Detective Kent, Detective West's participation ended entirely.  [*See* R. 65 at 57–58, 61.]  Detective Kent completed the investigation, prepared the official investigative narrative, and presented her findings to Ovey.  [R. 45-12 at 3, ¶ 7.]

For her part, Tucker heard nothing more about the investigation until March 2012, when Brock Thomas, at Ovey's request, arranged a meeting for April 3, 2012 between

---

[3] Despite sharing the same surname, Brock Thomas and Donna Thomas do not appear to be related.

[4] In addition, Heaton did not discuss the investigation with G. L. Ovey or the Kentucky State Police.  [*See* R. 48 at 46–48, 50–51 (Heaton's Deposition).]

4

himself, Ovey, James "Bridgie" Miller, the Caldwell County Attorney, and Tucker. [*See* R. 45-2 at 3; R. 49 at 54–55; R. 56-1 at 5, ¶ 27.] During that meeting, Ovey presented Tucker with an ultimatum: either resign or face the possibility of indictment before a grand jury. [*See* R. 45-2 at 3; R. 46 at 77–83 (Tucker's Deposition Part I); R. 49 at 54–55; R. 56-1 at 5, ¶ 28.] Tucker refused to resign. [*See* R. 45-2 at 3; R. 49 at 55.]

Ten minutes after the meeting ended, Don Weedman, the Chief of Police for the City of Princeton, told Tucker to come to the stationhouse. [R. 56-1 at 5, ¶ 29.] Based, allegedly, on findings from Detectives Kent's investigation, Chief Weedman suspended Tucker from her position with the City of Princeton Police Department. [*See* R. 50-2 at 2, ¶ 2 (Chief Weedman's Affidavit); *see also* R. 56-1 at 5, ¶ 29.] Later that same day, Brock Thomas called Tucker to ask if the City had suspended her. [R. 56-1 at 5, ¶ 29.] When she responded affirmatively, he suspended Tucker from her position as the Caldwell County Animal Control Officer too. [*Id.*; *see also* R. 45-4 at 1 (Notice of Suspension).]

On June 22, 2012, the Caldwell County Grand Jury returned a two-count indictment against Tucker, charging her with appropriating public funds in an amount less than $10,000.00, in violation of Ky. Rev. Stat. § 522.050(3)(a), and with falsifying public records, in violation of Ky. Rev. Stat. § 519.060. [R. 45-5 at 1 (Indictment).] Count I was based on the allegation that Tucker had appropriated certain "horse adoption fees." [R. 56 at 5 (Response to County's Motion for Summary Judgment).] Count II was based on the accusation that Tucker had signed off on inaccurate timesheets. [*Id.*]

Two days after the indictment returned, Chief Weedman changed Tucker's suspension to one without pay, [R. 50-2 at 2, ¶ 3], as did Brock Thomas the day after that,

5

[R. 45-6 at 1 (Revised Notice of Suspension)].   On December 4, 2012, the Caldwell County Fiscal Court voted to terminate Tucker's employment as the Caldwell County Animal Control Officer.   [R. 45-11 at 1 (Caldwell County Fiscal Court Minutes).]   The City of Princeton terminated Tucker's employment as a law-enforcement officer on December 12, 2012.  [R. 50-2 at 3, ¶ 5.]

Originally, Tucker's trial was scheduled to begin on May 14, 2013.  [R. 56-1 at 5, ¶ 31.]  When the time for trial came, however, the Commonwealth sought and obtained— over Tucker's objection—a continuance.  [*Id.*, ¶¶ 32–33.]  Meanwhile, Ovey pursued the possibility of a plea bargain, including an offer of pretrial diversion.  [*Id.* at 5–6, ¶¶ 34– 35.]  Maintaining her innocence, Tucker refused to accept anything less than dismissal of all charges against her with prejudice.  [*Id.*]

On September 6, 2013, one business day before Tucker's rescheduled trial, Ovey asked the Caldwell Circuit Court to dismiss all charges against Tucker without prejudice. [*See* R. 45-12 at 5, ¶ 15; R. 45-13 at 1 (Order of Dismissal); R. 63-1 at 1 (News Article).] The indictment returned against Tucker supposedly rested on multiple incidences of criminal conduct.  [R. 45-12 at 5–6, ¶ 16.]  However, in *Johnson v. Commonwealth*, 405 S.W.3d 439 (Ky. 2013), the Kentucky Supreme Court held that "a general jury verdict based on an instruction including two or more separate instances of a criminal offense, whether explicitly stated in the instruction or based on the proof[,] violates the requirement of a unanimous verdict."  *Id.* at 449.  Ostensibly, Ovey thought the Kentucky Supreme Court's decision in *Johnson* complicated the presentation of the Commonwealth's case against Tucker.  [*See* R. 45-12 at 5–6, ¶¶ 15–17.]  Though Tucker

opposed Ovey's motion and demanded a trial, [*see* R. 55-1 at 6, ¶ 36], the Caldwell Circuit Court dismissed the indictment without prejudice, [*see* R. 45-13 at 1].

After obtaining the order of dismissal, Ovey declined to seek a new indictment. [R. 45-12 at 6, ¶¶ 17–18.] Ovey offered the following justification for that decision:

> After much thought and after much reflection, the undersigned decided it was in the best interest of all concerned, including the Commonwealth, the Defendant and the community, not to return to a Caldwell County Grand Jury and seek a new indictment consistent with the dictates of *Johnson*. This was based upon the fact that the utility of a continued prosecution regarding this matter would continue to divide the community considered in light of what is to be gained by taking the case to verdict. Further punishment had been imposed already without further prosecution since post-indictment Abigail Tucker was terminated from her position as a police officer with the [C]ity of Princeton and was terminated from her position as Animal Control Officer. I further considered her many good works during her tenure as Caldwell County's Animal Control Officer and with the Caldwell County Animal Rescue. My decision rested upon what I believed, as Commonwealth Attorney, to be the right, just and fair disposition in this case. However, my decision had no bearing on the merits of the case or Abigail Tucker's innocence.

[*Id.*, ¶ 17.] The Commonwealth appears to have disavowed any intention of further pursuing Tucker's prosecution. [*Id.*, ¶ 18.]

### B.

On September 2, 2014, Tucker filed this action in Caldwell Circuit Court against Heaton, Brock Thomas, Donna Thomas, Caldwell County Magistrate Bobby Lewis, Detective West, and Chief Weedman, in their individual and official capacities as officials or employees of the Commonwealth of Kentucky, Caldwell County, or the City of Princeton, respectively. [*See* R. 1-1 at 1–4, ¶¶ 1–17 (Complaint).] The case was timely removed to this Court. [*See* R. 1 at 1–3, ¶¶ 1–8 (Notice of Removal).]

Of Tucker's original claims, a fair number remain for disposition. Count I seeks to impose vicarious liability on Caldwell County for any constitutional torts committed

by Heaton, Lewis, or Brock Thomas, and on the City of Princeton for any constitutional

torts committed by Chief Weedman.  [R. 1-1 at 7, ¶¶ 34–37.]  Count III alleges a state

and federal constitutional claim for invasion of privacy against Heaton, Brock Thomas,

Donna Thomas, Lewis, Chief Weedman (all in their individual and official capacities),

Detective West (in his individual capacity only), Caldwell County, and the City of

Princeton.  [*Id.* at 8–9, ¶¶ 40–43.]  Count IV alleges a claim for defamation against

Lewis.  [*Id.* at 9, ¶¶ 44–48.]  Count V alleges a claim for common-law malicious

prosecution against Heaton, Brock Thomas, Donna Thomas, Lewis, and Detective West.

[*Id.* at 9–10, ¶¶ 49–54.]  Count VI alleges a claim for depravation of Tucker's civil rights

under the Kentucky Constitution and United States Constitution at the hands of Heaton,

Brock Thomas, Donna Thomas, Lewis, Chief Weedman (all in their individual and

official capacities), Detective West (in his individual capacity only), Caldwell County,

and the City of Princeton.  [*Id.* at 10–11, ¶¶ 55–59.]  Last but not least, Count VIII alleges

a claim for intentional infliction of emotion distress, also known as outrage, against

Heaton, Brock Thomas, Donna Thomas, Lewis, Chief Weedman (in his individual and

official capacity), and Detective West.[5]  [*Id.* at 13, ¶¶ 69–72.]  She seeks compensatory

---

[5] In a prior opinion, the Court dismissed Tucker's state and federal law claim for conspiracy, finding her conclusory allegations to be insufficient to satisfy the pleading standards discussed in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as well as her claim for intentional interference with a contractual relationship since she cannot recover for intentional interference with her own contract.  *Tucker v. Heaton*, No. 5:14-CV-00183-TBR, 2015 WL 3935883, at *3–6, *12 (W.D. Ky. June 26, 2015).  Though neither Detective West nor Don Weedman joined in the underlying motion, [*see* R. 14 at 1 (Motion for Judgment on Pleadings)], it seems apparent that the opinion disposed of both claims in their entirety—not just as to Heaton, Bobby Lewis, Brock Thomas, and Donna Thomas, *see Tucker*, 2015 WL 3935883, at *3–6, *12, *14.

The parties' papers reflect that understanding.  Tucker makes no mention, for example, of her claim for intentional interference with a contractual relationship in response to either Detective West or Chief Weedman's motions for summary judgment.  [*See* R. 55 at 9–18 (Response to Detective West's Motion for Summary Judgment); R. 57 at 6–11 (Response to City's Motion for Summary Judgement).]  Likewise, as to her claim for conspiracy, Tucker merely invites the Court to reconsider its prior decision. [*See* R. 55 at 18 ("However, the Court has already dismissed Tucker's conspiracy claim. . . . Tucker

and punitive damages as well as injunctive relief.  [*Id.* at 14–16.]  With discovery closed, those State, County and City officials move for summary judgment.  [*See* R. 45 at 1 (County's Motion for Summary Judgment); R. 50 at 1 (City's Motion for Summary Judgment); R. 51 at 1 (Detective West's Motion for Summary Judgment).]

## II.

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)).  "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, the State, County, and City officials must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Tucker's claims.  Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

---

respects the Court's previous ruling on the issue, but requests reconsideration.").]  Satisfied with its original decision on both subjects, the Court declines her invitation.

Assuming the State, County, and City officials satisfy their burden of production, Tucker "must—by deposition, answers to interrogatories, affidavits, and admissions on file— show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## III.

The State, County, and City officials seek summary judgment on all of Tucker's remaining claims, which are outlined and explained above.  Though it is arguable that Tucker has abandoned many of those claims, the Court will separately address each on the merits.  Ultimately, the Court finds no genuine dispute of material fact.  Even viewing the record in the light most favorable to Tucker, the State, County, and City officials are entitled to judgment as a matter of law.

## A.

To start, Tucker seeks to hold Caldwell County and the City of Princeton vicariously liable for any constitutional torts committed by Heaton, Lewis, Brock Thomas, or Chief Weedman, respectively.  [*See* R. 1-1 at 7, ¶¶ 34–37.]  For reasons explained more fully below, however, the Court finds no primary liability on the part of those individuals.  *See infra* Part III.B–F.  Accordingly, in the absence of any primary liability, there is no basis to hold Caldwell County or the City of Princeton vicariously, or secondarily, liable.  *City of Louisville v. Bergel*, 610 S.W.2d 292, 293 (Ky. 1980); *Haugh v. City of Louisville*, 242 S.W.3d 683, 687 (Ky. Ct. App. 2007).  Therefore, summary judgment in favor of Caldwell County and the City of Princeton is appropriate as to Tucker's vicarious liability claim.

10

**B.**

Moving to the substantive claims, Tucker's constitutional (as opposed to common-law) invasion-of-privacy claim fails as a matter of law.[6]  [*See* R. 1-1 at 8–9, ¶¶ 40–43.]   First, under Kentucky law, there is no "private right of action for state constitutional violations."  *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 536–37 (Ky. 2011); *accord Grise v. Allen*, No. 5:11-195-KKC, 2016 WL 1261077, at *9 (E.D. Ky. Mar. 30, 2016); *Jackson v. Steele*, No. 11-CV-72-DLB-EBA, 2014 WL 2801337, at *11 (E.D. Ky. June 19, 2014); *Cansler v. City of Henderson*, No. 4:06-CV-89-M, 2008 WL 4500041, at *7 (W.D. Ky. Oct. 2, 2008); *Allen v. Aramark Corp.*, No. 3:07CV-P260-M, 2007 WL 3120088, at *3 (W.D. Ky. Oct. 23, 2007).   Therefore, an invasion-of-privacy claim premised on the Kentucky Constitution goes nowhere.

Second, though a private right of action *does* exist for federal constitutional violations through, as pertinent here, 42 U.S.C. § 1983, *see Lambert v. Hartman*, 517 F.3d 433, 440 (6th Cir. 2008), a claim of that sort is time-barred.  Since § 1983 does not include a statute of limitations of its own, *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015), it borrows "the statute of limitations governing personal injury actions from the state where the § 1983 action was brought," *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) (citing *Wilson v. Garcia*, 471 U.S. 261, 275–76 (1985)).  In Kentucky, actions of that sort must be "commenced" within one year "after the cause of action accrue[s]." Ky. Rev. Stat. § 413.140(1)(a).  Accordingly, §

---

[6] It is at least arguable that Tucker has abandoned her invasion-of-privacy claim entirely.  For example, she devotes no more than a sentence to that claim in response to Detective West and the County's motions for summary judgment, [R. 55 at 17–18; R. 56 at 21 (Response to County's Motion for Summary Judgment)], and makes no mention of it at all in response to the City's motion, [*see* R. 57 at 6–11 (Response to City's Motion for Summary Judgment)].

1983 actions in Kentucky are subject to a one-year limitations period.  *Collard v. Ky. Bd. of Nursing*, 896 F.2d 179, 182 (6th Cir. 1990).

Here, Tucker has not identified any actionable conduct by Heaton, Donna Thomas, or Detective West following her indictment on June 22, 2012.  [*See* R. 46 at 98–99; R. 46-1 at 338 (Tucker's Deposition Part II).]  Likewise, she is not aware of any objectionable conduct on the part of Brock Thomas or Lewis after her termination by the Caldwell County Fiscal Court on December 3, 2012.  [*See* R. 46 at 99–100.]  Despite being placed on notice, [*see* R. 50-1 at 11–14 (City's Memorandum in Support of Motion for Summary Judgment)], Tucker has not pointed to any action taken by Chief Weedman to support her invasion-of-privacy claim, [*see* R. 57 at 6–11 (Response to City's Motion for Summary Judgment)].  In her own timeline, Tucker identifies no action taken by any of these individuals after December 2012.  [*See* R. 45-2 at 4.]  Tucker did not file suit, however, until September 2014.  [R. 1-1 at 1.]  Consequently, her invasion-of-privacy claim under § 1983 is time-barred.  Summary judgment on this claim is, therefore, appropriate.

## C.

Tucker's defamation claim against Lewis falters too, though for different reasons.[7]  [*See* R. 1-1 at 9, ¶¶ 44–48.]  Under Kentucky law, a claim for defamation, whether for slander or for libel, "shall cease or die with the person injuring or injured."  Ky. Rev. Stat. § 411.140.  In other words, actions for slander and libel terminate upon the death of the tortfeasor.  *Hayes v. Rodgers*, 447 S.W.2d 597, 599 (Ky. 1969); *Gray v. Cent. Bank & Tr. Co.*, 562 S.W.2d 656, 659 (Ky. Ct. App. 1978); *see also Innes v.*

---

[7] Again, it is at least arguable that Tucker has abandoned her defamation claim since she does not discuss it in any of her responsive papers.  [*See* R. 55 at 9–18; R. 56 at 11–21; R. 57 at 6–11.]

*Howell Corp.*, 76 F.3d 702, 709 (6th Cir. 1996) (upholding Ky. Rev. Stat. § 411.140 against constitutional challenge).  Lewis passed away in January 2016.  [*See* R. 46 at 170–71; *see also* R. 45-1 at 1 n.1 (County's Memorandum in Support of Motion for Summary Judgment).]   Pursuant to Ky. Rev. Stat. § 411.140, Tucker's claim for defamation died with him.  Therefore, summary judgment is proper as a matter of law.

### D.

Of the remaining portions of this action, the one most difficult to resolve, and the one most contested by the parties, is Tucker's common-law claim for malicious prosecution against Heaton, Brock Thomas, Donna Thomas, Lewis, and Detective West. [*See* R. 1-1 at 9–10, ¶¶ 49–54.]  In order to make out a common-law claim for malicious prosecution, the plaintiff must show that:

> [1] the defendant initiated, continued, or procured a criminal . . . proceeding . . . against the plaintiff; [2] the defendant acted without probable cause; [3] the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice; . . . [4] the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and [5] the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, —— S.W.3d ——, ——, 2016 WL 5244518, at *8 (Ky. 2016); *see also* Restatement (Second) of Torts § 653 (Am. Law Inst. 1977).  Since the tort of malicious prosecution is disfavored in the law, a plaintiff must strictly comply with the elements of the tort.  *Davidson v. Castner-Knott Dry Goods Co.*, 202 S.W.3d 597, 602 (Ky. Ct. App. 2006).

In this case, Heaton, Brock Thomas, Donna Thomas, Lewis, and Detective West maintain that Tucker's malicious prosecution claim fails because, among other things,[8]

---

[8] Heaton, Brock Thomas, Donna Thomas, Bobby Lewis, and Detective West posit an additional reason why Tucker's malicious prosecution claim fails:  The criminal proceeding was not terminated in her

she cannot show any of them initiated, procured, or continued the criminal proceeding against her. [*See* R. 45-1 at 10–13; R. 51-1 at 12–13 (Detective West's Memorandum in Support of Motion for Summary Judgment); R. 63 at 5–6 (County's Reply).] Tucker resists that suggestion. [*See* R. 55 at 10–12 (Response to Detective West's Motion for Summary Judgment); R. 56 at 12–15.] Though a close call in certain respects, ultimately, the Court concludes none of the persons Tucker named initiated, procured, or continued the criminal proceeding against her.

## 1.

Under Kentucky law, a wide assortment of conduct may qualify as initiating, procuring, or continuing the institution of criminal proceedings against the accused. In broad terms, a person "initiates" criminal proceedings "by making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against the accused." Restatement (Second) of Torts § 653 cmt. c. "The initiation of a criminal proceeding," then, encompasses actions such as "the actual arrest of a person, the return of an indictment, the issuance of an arrest warrant, or a summons to appear and answer criminal charges." *Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 665 (W.D. Ky. 2013) (quoting *Johnson v. St. Claire Med. Ctr., Inc.*, No. 2002-CA-001385-MR, 2003 WL 22149386, at *2 (Ky. Ct. App. Sept. 19, 2003)).

The "procurement" of criminal proceedings contemplates a wider range of conduct than mere initiation. *See Martin*, ⸺ S.W.3d at ⸺, 2016 WL 5244518, at *9.

---

favor. [*See* R. 45-1 at 13–15 (County's Memorandum in Support of Motion for Summary Judgment); R. 51-1 at 11–12 (Detective West's Memorandum in Support of Motion for Summary Judgment).] Since none of them initiated, procured, or continued the criminal proceeding against Tucker, however, the Court declines to address that question.

14

Generally speaking, "'procuring' a criminal . . . proceeding is synonymous with 'being the proximate and efficient cause of putting the law in motion against another person.'" *Martin*, —— S.W.3d at ——, 2016 WL 5244518, at *8. A person may "procure" the institution of criminal proceedings at the hands of a public official in one of two ways: (1) by directing or pressuring the official in such a way so as to actively persuade and induce the official to prosecute; or (2) by knowingly providing false or misleading information which causes the official to institute the criminal proceeding. Restatement (Second) of Torts § 653 cmt. g, *cited with approval in Lindle v. Fifth Third Bank*, No. 2011-CA-002166-MR, 2014 WL 1778407, at *4–5 (Ky. Ct. App. May 2, 2014); *see also* 52 Am. Jur. 2d *Malicious Prosecution* §§ 24–25, Westlaw (database updated Sept. 2016).

Last but not least, a person "continues" a criminal proceeding if he "takes an active part in continuing or procuring the continuation of criminal proceedings initiated by himself or by another" person. Restatement (Second) of Torts § 655; *see also* 52 Am. Jur. 2d *Malicious Prosecution* § 21, Westlaw (database updated Sept. 2016). In order for conduct to qualify as "continuing" a criminal proceeding, the person must "take an active part in [the] prosecution after learning that there is no probable cause for believing the accused guilty." Restatement (Second) of Torts § 655 cmt. c. It is not enough if the person merely "appears as a witness against the accused either under subpoena or voluntarily, and thereby aids in the prosecution of the charges which he knows to be groundless." Restatement (Second) of Torts § 655 cmt. c. Instead, his share "in continuing the prosecution must be active, as by insisting upon or urging further prosecution." Restatement (Second) of Torts § 655 cmt. c.

**2.**

**a.**

Here, the record does not support the conclusion that Heaton initiated, procured, or continued the criminal proceeding against Tucker.  It is undisputed that Heaton made no formal criminal complaint against Tucker.  Though Heaton asked Detective West to look into the Caldwell County Animal Shelter's finances, [*see* R. 48 at 35, 41], he played no part in Detective West or Detective Kent's subsequent investigation, or in the decision to pursue charges against Tucker, [*see id.* at 46–48; *see also* R. 45-12 at 2–3, ¶ 6].  In sum, Heaton took no action to initiate, procure, or continue the criminal proceeding at issue.

**b.**

Likewise, Tucker has pointed to nothing in the record to suggest that Lewis initiated, procured, or continued the prosecution against her.  In fact, it appears as if Tucker has abandoned her malicious-prosecution claim against Lewis in its entirety.  [*See* R. 56 at 12–15.]  Nonetheless, as reflected in the parties' briefing, there is just no factual basis from which a reasonable jury could conclude that Lewis initiated, procured, or continued Tucker's prosecution.

**c.**

Next, the record does not indicate that Detective West initiated, procured, or continued the criminal proceeding against Tucker.  Detective West did not, for example, arrest, issue a criminal citation to, or detail the potential offenses against, Tucker.  *See Phat's Bar*, 918 F. Supp. 2d at 665.  In addition, Detective West had no role in deciding to prosecute Tucker.  [*See* R. 65 at 57; *see also* R. 45-12 at 1–3, ¶¶ 3, 6.]  While the

16

preliminary investigation started with Detective West, [*see* R. 65 at 31–32], it ultimately ended with Detective Kent of the Kentucky State Police, [*see id.* at 55–58, 61, 88–89]. She completed the investigation, prepared the official investigative narrative, and presented her findings to Ovey.  [R. 45-12 at 3, ¶ 7.]  Based on the information in Detective Kent's report, Ovey made the decision to pursue charges before the Caldwell County Grand Jury.  [*See id.*, ¶¶ 7–8.]  Detective West did not testify at that or any other hearing.  [R. 65 at 57; *see also* R. 45-5 at 2 (listing witnesses who appeared before the Caldwell County Grand Jury).]  Ultimately, Tucker has pointed to no evidence that Detective West had any role in initiating, procuring, or continuing her prosecution.

### d.

There is also nothing in the record to suggest that Brock Thomas initiated, procured, or continued the criminal proceeding against Tucker.  Again, Brock Thomas made no formal criminal complaint against Tucker.  In addition, he had no involvement with the investigation at all prior to Ovey's decision to pursue charges against Tucker. [*See* R. 65 at 86.]  It is true that, upon Ovey's request, Brock Thomas tried to locate, unsuccessfully, certain records relating to seemingly fictitious horse adoption fees.  [R. 49 at 94–97.]  Yet, a person "who merely responds to requests for information does not, by those acts, institute or continue a prosecution."  *Whittaker v. Duke*, 473 F. Supp. 908, 910 (S.D.N.Y. 1979); *see also* Restatement (Second) of Torts § 653 cmt. g; 54 C.J.S. *Malicious Prosecution* § 16, Westlaw (database updated Sept. 2016) ("Merely providing honest information from which a prosecution ensues is not instigation for purposes of a malicious prosecution claim.").  While Brock Thomas testified before the Caldwell County Grand Jury, Tucker concedes his testimony is privileged under Kentucky law.

17

[*See* R. 56 at 14.]   There are not facts, in short, demonstrating that Brock Thomas initiated, procured, or continued Tucker's prosecution.

**e.**

Though a closer call than the other officials, it does not appear as though Donna Thomas initiated, procured, or continued Tucker's eventual prosecution either.  Like those persons discussed before, Donna Thomas made no formal criminal complaint against Tucker.  She had at least *some* involvement, however, in the subsequent investigation.  It is undisputed that Detective West interviewed Donna Thomas on three or four occasions concerning the management and operation of the Caldwell County Animal Shelter.  [*See* R. 47 at 39–40, 41–44.]  On at least one of those occasions, Donna Thomas implied that Tucker had allowed her to submit inaccurate payroll records based on an informal arrangement with her coworkers to work some of their hours.  [*See id.* at 30–33.]

Tucker claims that those statements were less than true and accurate.  [*See* R. 56 at 13–14.]  She had not approved of the informal arrangement and, upon learning of it, she says, contacted Brock Thomas who soon straightened out the situation.  [R. 57-1 at 4, ¶¶ 19–24.]  The way Tucker sees things, Ovey would not have sought criminal charges against her but for Donna Thomas's false and misleading statements, which means that she "procured" the ensuing criminal proceeding.  [*See* R. 56 at 14.]

Tucker's argument is not without some merit.  Generally speaking, a person who supplies information to a prosecuting official does not "procure" the institution of a criminal proceeding so long as any decision to prosecute is left to the official's discretion. *See* Restatement (Second) of Torts § 653 cmt. g.  To that general proposition, however,

18

there is a widely-recognized exception:   A person who knowingly furnishes false information in order to induce an official to institute a criminal proceeding does "procure" the ensuing prosecution if the official would not have initiated the proceeding "but for" the false information supplied.  *See Martin*, —— S.W.3d at ——, 2016 WL 5244518, at *8; *see also* Restatement (Second) of Torts § 653 cmt. g; 52 Am. Jur. 2d *Malicious Prosecution* § 24.   The plaintiff bears the burden of establishing that the exception applies.  *See, e.g.*, *Danielson v. Hess*, 807 N.W.2d 113, 117 (S.D. 2011); *King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003).

In this case, Tucker has not carried that burden.   She has not identified "any specific facts suggesting that [Ovey's] decision to prosecute would not have been made but for the allegedly false and incomplete information" Donna Thomas furnished. *Danielson*, 807 N.W.2d at 117.   Unlike in many situations, *see* Restatement (Second) of Torts § 653 cmt. g, illus. 2 to 5, the record does not suggest that Donna Thomas took any affirmative action, such as contacting law enforcement, to set the law in motion against Tucker, *see Correllas v. Viveiros*, 572 N.E.2d 7, 10 (Mass. 1991).   Instead, Detective West approached Donna Thomas as part of a preexisting investigation and interviewed her on three or four occasions, each time at his request.  [*See* R. 47 at 23–24, 39–44.]. Ultimately, Detective Kent of the Kentucky State Police completed the investigation, [*see* R. 65 at 55–56, 88–87; *see also* R. 45-12 at 3, ¶ 7], and prepared an investigative narrative for Ovey, which included information from or pertaining to eleven additional witnesses besides Donna Thomas, [*see* R. 45-12 at 3–4, ¶¶ 7–9; *see also* R. 45-5 at 2]. Based on the findings in Detective Kent's comprehensive report, Ovey made an

independent decision to pursue charges against Tucker before the Caldwell County Grand Jury.  [R. 45-12 at 3, ¶¶ 7–8.]

Since Ovey's decision to prosecute was based on an independent investigation, and not on the allegedly false information Donna Thomas supplied, she did not, as a matter of law, "procure" the ensuing prosecution.  *See Danielson*, 807 N.W.2d at 117; *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 613 (Mich. 1998); *see also* Restatement (Second) of Torts § 653 cmt. g.  Likewise, there is nothing to suggest Donna Thomas initiated or continued Tucker's prosecution.  Therefore, summary judgment as to Tucker's malicious prosecution claim is proper as a matter of law.

### E.

Tucker's penultimate claim, which alleges some sort of depravation of her civil rights under the Kentucky Constitution and United States Constitution, does not fare so well either.[9]  [*See* R. 1-1 at 10–11, ¶¶ 55–59.]  As discussed earlier, *see supra* Part III.B, Kentucky has refused to recognize a "private right of action for state constitutional violations," *Straub*, 354 S.W.3d at 536–37, and while Congress has created a private right of action for federal constitutional violations vis-à-vis 42 U.S.C. § 1983, such actions are subject to a one-year limitations period, *Collard*, 896 F.2d at 182.  In this case, Tucker has not identified any actionable conduct taken by Heaton, Brock Thomas, Donna Thomas, Lewis, Detective West, or Chief Weedman during that period of time.  Accordingly, since Tucker's claim, if any, is time-barred, summary judgment is appropriate.

---

[9] Like many of Tucker's other claims, she says little in way of support for her civil rights claim as to Heaton, Brock Thomas, Donna Thomas, Lewis, or Detective West, [R. 55 at 17; R. 56 at 21], and nothing as to Chief Weedman and the City of Princeton, [*see* R. 57 at 6–11].

**F.**

Last but not least, Tucker brings a claim for intentional infliction of emotional distress, also known as outrage, against Heaton, Lewis, Brock Thomas, Donna Thomas, Detective West, and Chief Weedman.  [*See* R. 1-1 at 13, ¶¶ 69–72.]  In order to establish a common-law claim for intentional infliction of emotional distress,

> [1] the wrongdoer's conduct must be intentional or reckless; [2] the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there must be a causal connection between the wrongdoer's conduct and the emotional distress; and [4] the emotional distress must be severe.

*Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004), *abrogated on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014), *as corrected* (Ky. Apr. 7, 2015), *and reh'g denied* (Ky. May 14, 2015); *see also Childers v. Geile*, 367 S.W.3d 576, 579 (Ky. 2012).  The Court must decide, as to the second element, "whether the conduct complained of can reasonably be regarded to be so extreme and outrageous as to permit recovery" unless reasonable minds could differ on the subject.  *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 544 (Ky. Ct. App. 2013) (quoting *Goebel v. Arnett*, 259 S.W.3d 489, 493 (Ky. Ct. App. 2007)).  The bar is set high, for, under Kentucky law, "a claim for the tort of outrage requires the plaintiff to prove conduct which is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Hume v. Quickway Transp., Inc.*, No. 3:16-cv-00078-JHM, 2016 WL 3349334, at *9 (W.D. Ky. June 15, 2016) (quoting *Futrell v. Douglas Autotech Corp.*, No. 5:09-CV-21, 2010 WL 1417779, at *4 (W.D. Ky. Apr. 2, 2010)); *see also Mineer v. Williams*, 82 F. Supp. 2d 702, 706 (E.D. Ky. 2000) ("The standards for this tort are strict.").

21

Even when viewed in the light most favorable to her, Tucker has identified no "outrageous and intolerable" conduct approaching that threshold.  Her claim is based, in principal part, on the actions discussed earlier in this opinion.  *See supra* Part I.A. Though some of that conduct is offensive, and perhaps even troubling, it cannot be "reasonably regarded as rising to the level of extreme and outrageous" conduct as Kentucky defines that concept.  *Hume*, 2016 WL 3349334, at *9; *see also Stringer*, 151 S.W.3d at 789–91 (listing examples of actionable and nonactionable conduct); Restatement (Second) of Torts § 46 cmts. d to f (same).  Therefore, summary judgment as to Tucker's final claim is warranted too.

## VI.

Rodney Heaton, Bobby Lewis, Brock Thomas, Donna Thomas, and Caldwell County's Motion for Summary Judgment, [R. 45]; Don Weedman and the City of Princeton's Motion for Summary Judgment, [R. 50]; and Clifford West's Motion for Summary Judgment, [R. 51], are **GRANTED**.  An appropriate order will issue separate from this Memorandum Opinion.

Date:

cc:      Counsel of Record